STATE OF NORTH CAROLINA v. GARY LEE GAINES

No. 15

(Filed 14 March 1973)

1. **Criminal Law § 66— pretrial lineup — voice characteristics of defendant — lawfulness of lineup**

    A pretrial lineup for purposes of identification in a rape and burglary case was lawful and in nowise violated defendant's constitutional rights where the lineup participants were six slender young black men approximately six feet tall and within a reasonable age range, though defendant was the only subject in the lineup with voice characteristics peculiar to him alone.

2. **Criminal Law § 35— offense committed by another — exclusion of evidence proper**

    In a prosecution for rape and burglary the trial court did not err in excluding testimony tending to show that officers had eliminated one other than defendant as a suspect on *erroneous* information that the third person was working at the time of the alleged attack where the actual reason for exoneration of the third person was wholly immaterial.

3. **Criminal Law §§ 33, 35— evidence of shotgun in possession of third person — exclusion proper**

    In a rape and burglary prosecution testimony by a witness that she saw a third person with a double-barreled shotgun walking up and down the road threatening to shoot a girl three or four days before the prosecutrix in this case was attacked was totally lacking in probative value and was properly excluded.

4. **Criminal Law §§ 77, 113— admission of defendant to inmate — instruction proper**

    The trial judge in a rape case did not err in charging on statements made by defendant while in jail to another inmate that he had

---

State v. Gaines

---

raped a woman in Trinity at gunpoint where the charge left entirely to the jury the truthfulness of the statement and the weight to be given it.

5. **Criminal Law § 117— charge on defendant's credibility — no error**

The trial court's instruction that, if the jury found defendant was telling the truth, it was to give his testimony the same weight and effect that it would give the testimony of any disinterested witness was proper.

6. **Criminal Law §§ 113, 163— statement of evidence and contentions — objections to instructions — waiver**

The evidence offered by defendant as well as by the State, together with the contentions, was recapitulated by the trial court with reasonable accuracy, and any objections by defendant to the charge not made before retirement of the jury were deemed waived.

7. **Criminal Law § 98; Trial § 5— sequestration of witnesses — discretionary with trial court**

Defendant did not show an abuse of discretion by the trial judge in refusing to sequester the witnesses in a rape and burglary case; therefore, denial of the motion to sequester is not reviewed on appeal.

8. **Criminal Law § 127; Grand Jury § 3— exclusion of persons 18-21 years old from grand jury — remedy**

If defendant wished to object to the composition of the grand jury, his remedy was by timely motion to quash the bill of indictment, not by motion in arrest of judgment.

9. **Constitutional Law § 31— pretrial discovery — right of defendant to all of State's evidence**

The trial court did not err in denying defendant's pretrial motion for discovery of "any and all evidence in the possession of or known to the State of North Carolina favorable to or tending to favor the defendant" since the solicitor had no evidence favorable to defendant and since there is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.

10. **Criminal Law § 130— question asked witness by juror — no grounds for mistrial**

Where defendant's motion for mistrial was based on the single question "Are you still here?" put to a witness by a juror, there was no showing of prejudice to defendant and the motion was properly denied.

DEFENDANT appeals from judgments of *McConnell, J.*, 28 August 1972 Regular Criminal Session, RANDOLPH Superior Court.

State -v. Gaines

Defendant was charged in separate bills of indictment, proper in form, with first degree burglary and rape. The cases, by consent, were consolidated for trial.

Linda Jones, the prosecuting witness, testified that on 15 March 1972 she lived in Trinity, Randolph County, North Carolina, with her two children, ages three and five. Her husband is deceased. At approximately 11 p.m. on that date, she noticed an individual, with a double-barreled shotgun, standing at the doorway between the children's bedroom and the den. He told her to get undressed and repeated the command when she hesitated, saying, "I will give you five seconds." She requested the intruder to let the children go out and he did so, closing the door when they left. He then told her to hurry and, after she undressed, he placed the shotgun on one of the twin beds located in the room and raped Mrs. Jones on the other bed. He then removed ninety dollars from her purse and left the house the same way he had entered it. Mrs. Jones was medically examined the following morning, and a vaginal smear showed the presence of live sperm.

Mrs. Jones testified that her assailant, a Negro, was in her home about thirty minutes; that he was tall and thin, wearing a blue stocking over his head and face, a black jacket, and pants with either small checks or plaids; that he spoke in a low voice and she had difficulty in understanding what he said because he had "some kind of impediment"; that he made the following statements in her presence: "Take them off." "Get undressed." "Hurry up." "You have another bedroom?" "Who were those people here tonight?" "Where do you keep your money?" "Which bank?" "I thought you said you didn't have any money." "Are you going to call the sheriff?"

Shortly after the intruder left, officers were notified and went to her home. She described her assailant and told the officers she was not sure she could recognize him. The officers found the front screen door cut near the door handle, a one-inch pry mark on the door near the lock mechanism, and evidence that the door had been forced open.

On 24 May 1972 defendant was placed in a lineup with five other subjects. Counsel had been appointed to represent defendant and was present when the lineup was conducted. Each person in the lineup, upon request, repeated the following statements in the presence and hearing of the prosecuting witness:

(1) "Where do you keep your money?" (2) "Which bank?" (3) "I thought you said you didn't have any money." (4) "Are you expecting anybody?" Thereafter Mrs. Jones identified Number Four, the defendant, as the person who burglarized her home and raped her on the night of March 15. She explained her identification in these words: "After they repeated the questions, when he talked, I knew it, because I just couldn't forget that voice. There was no mistaking about it. The build and voice was all I used in making my identification. The tone of his voice and the way he spoke led me to identify his voice. He didn't speak very loud and it was just hard to understand. It was just his voice. It was exactly the same voice, and I am positive."

Following a voir dire examination, defendant's motion to suppress the in-court identification testimony of Mrs. Jones was denied and the evidence admitted.

Patricia Hill was in the juvenile section of the Randolph County Jail while defendant was in jail awaiting trial. She was being held for return to Samarkand Manor. She and defendant were in separate cells, within hearing distance, but could not see each other. She testified that defendant told her "that when they came and got me and took me back to Samarkand, that he was going to come down there and get me. He said he was going to rape me. . . . He said that he raped somebody. . . . I asked him how he done it, if they weren't willing. He said he just used a gun."

Sam Bagwell, deputy sheriff and assistant jailer, testified that he overheard the conversation between the defendant and Patricia Hill; that he was standing approximately eight feet from defendant's cell and that the only prisoners in the section of the jail set aside solely for juvenile personnel were Patricia Hill and the defendant; that he had just taken an elderly man up to an adjacent cell block and locked him up; that he heard defendant tell Patricia Hill that when he got out he was coming down to Samarkand and get her; that he would take her to the woods and rape her and then shoot her and leave her there so nobody would know who did it. "He told her that he was a mean fellow, that he had raped one woman in Trinity. Miss Hill asked him how he raped a woman, if she wasn't willing. He said she couldn't help herself because he had a gun on her."

Officer Bagwell further testified that he had been seeing defendant regularly for some weeks and knew his voice. "His

voice is not normal. Someway or another something about his voice, I would know it anywhere I heard it."

Defendant testified as a witness in his own behalf. He denied making any statement to Patricia Hill to the effect that he had raped a woman or that he was going to rape her. He said that while he was in jail he had difficulty with Officer Bagwell; that the officer had thrown him on the floor and stomped him. He further testified that he was in Washington, D. C., on 15 March 1972, making application for employment with the Job Corps; that he stayed with his aunt in Washington on the night of March 15 when Mrs. Jones was allegedly raped. He denied that he had ever been in the home of Linda Jones or had ever committed an assault upon her or had ever taken anything of value from her. He admitted on cross-examination that he had escaped from a training school sometime prior to 15 March 1972.

Trudah Mills testified that defendant is her nephew; that he spent the night of 14 March 1972 at her home on Eleventh Street in Washington, D. C.; that on the morning of March 15 she took him to the Job Corps Office where he applied for the Job Corps program and signed the application; that she also signed it; that he stayed with his girl friend until about 11:30 p.m. on the night of March 15 and "then I took him home with me, because I didn't feel he should stay."

Elmo T. Jones, Jr., testified he was a senior counselor employed by the Job Corps; that he saw defendant "on the 15th, I think, it was on a Tuesday or a Wednesday, I am not sure"; that he filled out a form which defendant signed. Defendant's Exhibit D-1 was identified by this witness as a Xerox copy of the form, dated March 15, 1972, bearing the signature of Gary Lee Gaines which defendant signed in his presence.

By way of rebuttal, the State offered Oliva Barrino who testified that she knew defendant; that at approximately 4:45 p.m. on the day before, she heard on the news that Mrs. Jones had been assaulted, she saw defendant on the porch at his home in Asheboro. She said: "I can't testify what day it was on the news. When I heard it on the news, I know I seen him the day before. That is a known fact."

Booker Thomas McClooney testified that his son Thomas McClooney, Jr., and defendant were close friends in March 1972;

that defendant and his sister and another girl from Thomasville came to his home after midnight on March 21; that defendant was there before March 21 and before March 15—"they was there mostly all the time. I saw him during the month of March. No question in my mind at all." This witness further testified that his son was at work between the hours of 11:00 p.m. and 1:00 a.m. on the night of March 15; that he carried the officers to the place where his son worked to verify that fact.

Defendant's rebuttal evidence tends to show that although Thomas McClooney, Jr., was paid for thirteen hours work commencing at 4:23 p.m. on 15 March 1972, he evidently did not work thirteen hours; that somebody punched his card in at 9:30 p.m. but McClooney wasn't there and the 9:30 was marked through with a pencil; that McClooney actually returned to the plant between 11:00 and 11:30 p.m. on the night of March 15.

Dolan Ingram testified that on 15 March 1972, Thomas McClooney, Jr., called about "quarter to nine and told me to come and pick him up off work for break or lunch, or something, and I picked him up at 9 o'clock and brought him to Trinity and put him out at . . . his daddy's house. . . . I didn't see him again after that."

Lonnie Burke, Jr., a rebuttal witness for defendant, testified that he knew Thomas McClooney, Jr., and the defendant; that they ran around together; that there is a wooded area between the house where Mrs. Linda Jones lives for about a half a mile before you get to Cotton Row where both defendant and McClooney live; that "in blocks, it would be about three or four blocks."

Defendant sought to prove by the witness Jessie Mae Burke that three or four days before Mrs. Jones was raped she saw Thomas McClooney, Jr., with a double-barreled shotgun walking up and down the road threatening to shoot a girl. Defendant excepts to the exclusion of this evidence.

Defendant's motion for judgment of nonsuit at the close of all the evidence was denied. The jury returned a verdict of guilty of burglary in the first degree and guilty of rape, recommending life imprisonment in each case. Judgments were pronounced accordingly and defendant appealed. Errors assigned will be discussed in the opinion.

State v. Gaines

*Robert Morgan, Attorney General; Claude W. Harris and Charles M. Hensey, Assistant Attorneys General, for the State of North Carolina.*

*David M. Dansby, Jr., attorney for defendant appellant.*

HUSKINS, Justice.

[1]  Defendant contends the court erred in permitting the prosecuting witness to identify him as her assailant on the ground that her in-court identification was based upon a pretrial lineup so unnecessarily suggestive and conducive to mistaken identification as to be a denial of due process under the Fourteenth Amendment.

The constitutional principles relied on by defendant are well established. *Stovall v. Denno,* 388 U.S. 293, 18 L.Ed. 2d 1199, 87 S.Ct. 1967 (1967), states that the "totality of circumstances" may show the use of lineup procedures "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to be a denial of due process under the Fourteenth Amendment. To like effect is *Foster v. California,* 394 U.S. 440, 22 L.Ed. 2d 402, 89 S.Ct. 1127 (1969). The evidence in this case, however, does not support defendant's contention.

Here, the voir dire disclosed that the lineup in question was composed of six Negro males. The defendant was fifteen years old, 6 feet tall and weighed 135 pounds; Reginald Garner was nineteen years old, 6 feet tall and weighed 150 pounds; George Scales was twenty-four years old, 6 feet tall and weighed 156 pounds; Wiley Spinks was twenty years old, 6 feet 1½ inches tall and weighed 155 pounds; Red Coble was twenty-two years old, 6 feet 3½ inches tall and weighed 170 pounds, and Thomas McClooney, Jr., was eighteen years old, 5 feet 11 inches tall and weighed 160 pounds. Each subject was placed in the lineup and given a number. Upon request, each repeated these four statements in the presence of the prosecuting witness: (1) "Where do you keep your money?" (2) "Which bank?" (3) "I thought you said you didn't have any money." (4) "Are you expecting anybody?" Mrs. Jones identified defendant, holding Number Four, as the person who burglarized her home and raped her on the night of March 15, 1972. She explained her identification in these words: "After they repeated the questions, when he talked, I knew it, because I just couldn't forget that voice. There was no mistaking about it. The build and voice was all I

used in making my identification. The tone of his voice and the way he spoke led me to identify his voice. He didn't speak very loud and it was just hard to understand. It was just his voice. It was exactly the same voice, and I am positive."

Based upon this showing, the trial judge concluded that " . . . the lineup was a lawful lineup which in nowise violated the defendant's constitutional rights. . . ." We agree. Although there is some disparity in age, height and weight of the lineup participants, these differences do not render the identification procedures so "unnecessarily suggestive and conducive to irreparable mistaken identification" as to constitute a denial of due process. The State is not required to produce lineup subjects who are in all respects identical to the suspect. If such were the rule, no lineup would be valid because no two men are alike. Here, the lineup subjects approximated the general physical description given by the victim; and defendant was not rendered conspicuous by police procedures. The mere fact that defendant had specific identifying characteristics not shared by the other participants does not invalidate the lineup.

Thus, the fact that defendant was the only subject in the lineup with voice characteristics peculiar to him alone in nowise tainted the procedure. Manifestly, neither his tone of voice nor manner of speech was the product of police manipulation.

The fact that defendant was the youngest and the lightest man in the lineup is likewise insufficient to taint the procedure. All participants were slender young black men approximately six feet tall and within a reasonable age range. See *State v. Rogers*, 275 N.C. 411, 168 S.E. 2d 345 (1969), where cases are cited illustrating the suggestive, unfair type of lineup condemned in *Foster v. California, supra*. It is perfectly apparent that defendant has not been the victim of rigged, suggestive lineup procedures which *Stovall* and *Foster* were designed to deter. This assignment is overruled.

On cross-examination of SBI Agent David Marshall, defendant attempted to elicit testimony tending to show that the officers had eliminated Thomas McClooney, Jr., as a suspect on erroneous information that McClooney was working at the time of the attack on the prosecutrix. Upon objection, this evidence was excluded.

The court also excluded testimony defendant sought to elicit from Jessie Mae Burke that she had seen Thomas McClooney,

State v. Gaines

Jr., with a double-barreled shotgun three or four days prior to the attack on Mrs. Jones. These exclusions constitute defendant's next assignment of error.

[2] The law of this State with respect to the admissibility of evidence tending to show the guilt of one other than the accused is rather unsettled. *See* Stansbury *N. C. Evidence* § 93 (Brandis Rev. 1973) ; *State v. Shinn,* 238 N.C. 535, 78 S.E. 2d 388 (1953) ; *State v. Smith,* 211 N.C. 93, 189 S.E. 175 (1937) ; *State v. Gee,* 92 N.C. 756 (1885) ; *State v. Baxter,* 82 N.C. 602 (1880) ; *State v. White,* 68 N.C. 158 (1873). See 22A C.J.S. *Criminal Law* § 622 (1961) for a general discussion of the subject. We deem it unnecessary, however, to discuss this area of the law in order to decide the case before us.

Here, defendant's questions to David Marshall were apparently designed to lay a foundation for evidence tending to show that Thomas McClooney, Jr., was not in fact at work from 11:00 p.m. until 11:30 p.m. on the night Mrs. Jones was raped. By this later evidence, defendant expected to show that the officers had eliminated McClooney as a suspect on the basis of *erroneous* information that McClooney was at work at that time. However, the evidence later offered by defendant failed to show that McClooney was not at work. Instead, the testimony of Grady Brannon and Otto Wilburn tends to show that Thomas McClooney, Jr., was on the job at 11:30 p.m. Mrs. Jones testified that her assailant was first seen in her home at approximately 11:00 p.m. and remained there about thirty minutes. She lived in Trinity and McClooney worked at Hendrix Batten Company in High Point. The distance from the home of Mrs. Jones to the Hendrix Batten Company plant is not shown by the record. Nevertheless, it may be inferred that if McClooney was on the job at 11:30 p.m. he could not have been present in the home of Mrs. Jones in another county at approximately the same time. Thus, the reason the officers exonerated Thomas McClooney, Jr., was wholly immaterial, and exclusion of such evidence was not error.

[3] The fact that McClooney was seen by Jessie Mae Burke with a double-barreled shotgun walking up and down the road threatening to shoot a girl three or four days before Mrs. Jones was attacked, is totally lacking in probative value. It has no tendency to inculpate McClooney or exculpate defendant. It is wholly irrelevant in this case. Objections thereto were properly sustained and the evidence properly excluded.

Defendant's next assignment relates to various errors allegedly committed in the charge.

[4] Defendant asserts the trial court committed prejudicial error "in charging the jury that the statement attributed to him by two witnesses [Patricia Hill and Officer Bagwell] that he had raped a woman in Trinity constituted an admission. There was no statement by the defendant that he raped the prosecutrix. There was no statement that he committed rape on March 15, 1972."

We perceive no error in the court's charge on this point. "Anything that a party to the action has said, if relevant to the issues and not subject to some specific exclusionary rule, is admissible against him as an admission." Stansbury *N. C. Evidence* § 167 (2d ed. 1963) ; *State v. Woolard,* 260 N.C. 133, 132 S.E. 2d 364 (1963) ; *State v. Bryson,* 60 N.C. 476 (1864).

Here, Patricia Hill testified concerning defendant: "He said he was going to rape me. . . . He said that he raped somebody. . . . He said he just used a gun." Deputy Sheriff Sam Bagwell testified he heard defendant tell Patricia Hill that when he got out he would rape her and " . . . that he had raped one woman in Trinity. . . . She couldn't help herself because he had a gun on her." The relevancy of these statements or admissions, in light of the evidence that the prosecutrix was raped in Trinity by a man who used a double-barreled shotgun during the attack, is obvious. Referring to that evidence, the trial court said: "There is evidence which tends to show that the defendant had admitted the fact relating to the crime charged, or the crimes charged in this case, or to the crime of rape. If you find the defendant made that admission, then you should consider all of the circumstances under which it was made, and determine whether it was a truthful admission, and the weight you will give to it. . . . That is a matter for the jury to determine." While not couched in the wisest choice of words, the charge leaves entirely to the jury the determination of whether defendant raped a woman in Trinity and, if so, whether Mrs. Jones was the victim. This leaves no valid ground for complaint.

Even if the judge's statement be considered technically incorrect, it was not prejudicial for, in our opinion, it is highly unlikely that omission of this portion of the charge would have produced a different result in the trial. *Compare State v. Barrow,* 276 N.C. 381, 172 S.E. 2d 512´ (1970). Be that as it may,

a charge must be construed contextually, and isolated portions will not be held prejudicial when the charge as a whole is correct. *State v. Cook,* 263 N.C. 730, 140 S.E. 2d 305 (1965) ; *State v. Goldberg,* 261 N.C. 181, 134 S.E. 2d 334 (1964).

[5]   The court charged the jury to scrutinize defendant's testimony carefully in light of his interest in the outcome of the case. If the jury found he was telling the truth, it was instructed to give his testimony "the same weight and effect that you would give the testimony of any disinterested witness." Defendant argues that such an instruction is tantamount to charging that defendant's testimony should not be believed.

   The challenged instruction has been approved in many decisions of this Court, including *State v. Barrow,* 276 N.C. 381, 172 S.E. 2d 512 (1970) ; *State v. Turner,* 253 N.C. 37, 116 S.E. 2d 194 (1960) ; *State v. Worrell,* 232 N.C. 493, 61 S.E. 2d 254 (1950) ; *State v. Parsons,* 231 N.C. 599, 58 S.E. 2d 114 (1950) ; *State v. Hightower,* 226 N.C. 62, 36 S.E. 2d 649 (1946) ; *State v. Redfern,* 223 N.C. 561, 27 S.E. 2d 441 (1943) ; *State v. McKinnon,* 223 N.C. 160, 25 S.E. 2d 606 (1943).

[6]   Defendant further argues that the trial court "devoted almost the entire charge to recapitulation of the evidence of the State and to restating the contentions of the State," in violation of G.S. 1-180. An examination of the charge reveals no basis for this broadside attack. The evidence offered by defendant as well as by the State, together with the contentions, is recapitulated with reasonable accuracy. The law requires no more. Furthermore, it is a general rule that objections to the charge in reviewing the evidence and stating the contentions of the parties must be made before the jury retires so as to afford the trial judge an opportunity for correction; otherwise they are deemed to have been waived and will not be considered on appeal. *State v. Virgil,* 276 N.C. 217, 172 S.E. 2d 28 (1970). All assignments to the charge are overruled.

[7]   Defendant assigns as error denial of his motion to sequester the witnesses. Sequestration of witnesses is discretionary with the trial judge—not a matter of right. Stansbury *N. C. Evidence* § 20 (Brandis Rev. 1973). Denial of a motion to sequester is not reviewable unless an abuse of discretion is shown. *State v. Barrow, supra* (276 N.C. 381, 172 S.E. 2d 512) ; *State v. Clayton,* 272 N.C. 377, 158 S.E. 2d 557 (1968). Here, no abuse of discretion appears.

Defendant moved in arrest of judgment and, in support of the motion, sought to prove that all persons between eighteen and twenty-one years of age had been systematically excluded from the grand jury which returned the bill of indictment in this case. Denial of the motion is asserted as error.

[8]    Defendant has misconceived his remedy. A motion in arrest of judgment is proper when, and only when, some fatal error or defect appears on the face of the record proper. *State v. McClain,* 282 N.C. 357, 193 S.E. 2d 108 (1972); *State v. Higgins,* 266 N.C. 589, 146 S.E. 2d 681 (1966). "The record proper in any action includes only those essential proceedings which are made of record by the law itself, and as such are self-preserving. [Citations omitted.] The evidence in a case is no part of the record proper. [Citation omitted.] In consequence, defects which appear only by the aid of evidence cannot be the subject of a motion in arrest of judgment." *State v. Gaston,* 236 N.C. 499, 73 S.E. 2d 311 (1952). The record proper in criminal cases ordinarily consists of (1) the organization of the court, (2) the charge, *i.e.,* the information, warrant or indictment, (3) the arraignment and plea, (4) the verdict, and (5) the judgment. *State v. Tinsley,* 279 N.C. 482, 183 S.E. 2d 669 (1971). Thus, defendant's motion in arrest of judgment was properly denied. If he wished to object to the composition of the grand jury, his remedy was by timely motion to quash the bill of indictment. *See State v. Brinson,* 277 N.C. 286, 177 S.E. 2d 398 (1970); *State v. Rorie,* 258 N.C. 162, 128 S.E. 2d 229 (1962). This assignment has no merit.

[9]    Defendant contends the trial court erred in denying his pretrial motion for discovery of "any and all evidence in the possession of or known to the State of North Carolina favorable to or tending to favor the defendant." Defendant does not rely on G.S. 15-155.4, and wisely so, since that statute does not contemplate anything resembling the demand embraced in his motion. *See State v. Peele,* 281 N.C. 253, 188 S.E. 2d 326 (1972); *State v. Macon,* 276 N.C. 466, 173 S.E. 2d 286 (1970). Instead, he relies on the following language from *Brady v. Maryland,* 373 U.S. 83, 10 L.Ed. 2d 215, 83 S.Ct. 1194 (1963):

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt

State v. Gaines

or to punishment, irrespective of the good faith or bad faith of the prosecution."

The standards enunciated in *Brady* by which the solicitor's conduct in this case is to be measured require us to determine whether there was (a) suppression by the prosecution after a request by the defense (b) of material evidence (c) favorable to the defense. Obviously, under *Brady* a refusal to grant a pretrial motion for discovery is not reversible error unless the movant shows that evidence favorable to him *was suppressed.* In order to do so, he must certainly show what that evidence was. Defendant has made no such showing here. The solicitor stated he had no evidence favorable to the defendant and nothing in this record contradicts him. "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois,* 408 U.S. 786, 33 L.Ed. 2d 706, 92 S.Ct. 2562 (1972) ; *State v. Davis,* 282 N.C. 107, 191 S.E. 2d 664 (1972). Defendant's motion was properly denied.

Remaining assignments of error relate to denial of motion for nonsuit and motion for mistrial. There is no merit in either motion.

When the evidence is considered in the light most favorable to the State, it is sufficient to carry the case to the jury and to support the verdict and judgment. *State v. Vincent,* 278 N.C. 63, 178 S.E. 2d 608 (1971) ; *State v. Primes,* 275 N.C. 61, 165 S.E. 2d 225 (1969) ; *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469 (1968).

[10] The motion for mistrial was based upon a conversation between a juror and one of the State's witnesses. The record reveals that all the juror said to the witness was: "Are you still here?" Nothing about the case was discussed. The juror did not even know that the person to whom he spoke was a witness in the case when he spoke to him. Thus nothing improper was said or done and there was no occasion for the trial judge to order a mistrial. Ordinarily, a mistrial or new trial is not required " . . . if there is nothing to show that the communication between the jury and the witness was improper or that the party complaining was prejudiced thereby." *State v. Shedd,* 274 N.C. 95, 161 S.E. 2d 477 (1968). The discretionary ruling of the court denying the motion for a mistrial was proper on the facts.

Defendant having failed to show prejudicial error, the verdicts and judgments in the trial court must be upheld.

No error.